Good morning. This is James Baker. I'm appearing for Mr. Juarez and his daughter. Can you hear me? Yes. Okay. The critical issue here concerns what appellant has termed for want of a better expression, the broad domain principle. In terms of determining functional equivalence for children applying for SSI benefits, the principle basically says that in order to have a marked or extreme limitation in one of the six domains, not all of the domain's activities or functions needs to be limited to a marked or extreme degree. For instance, a child with a severe learning disability does not also have to have a low IQ. A little boy with a marked inability to stand and walk does not also need to show that he has serious upper extremity problems as well. A girl with severe, even life-threatening anorexia can have a marked or extreme limitation in the domain of caring for yourself, even if she has good personal hygiene and looks before crossing the street and exhibits good impulse control. This is a key concept in the regulations describing functional equivalence. Without it, some considerable fraction of the children who now qualify for SSI benefits might no Although this court has never had a case in this case. Could I ask you one question about that, please? I understood you to be saying that the CELF-4 test scores alone of RRO should have been enough for the ALJ to conclude that she had a marked limitation in one or more domains. But I understood that our practice and the plaintext of the regulations are that test scores alone are insufficient to establish such a limitation. I mean, am I misunderstanding either your argument or the regulations? Well, in a way, I think so. My reading of the regulations is that a valid test score that is uncontradicted by other evidence is in fact determinative. If, on the other hand, let's say a child like RRO has very low language scores, but there's lots of anecdotal evidence that she seems to be able to speak perfectly well, or if there's a contradictory test score, then you can't rely on the test score alone. But I do believe that the regulations prioritize standardized tests. So the ALJ came here to look at other pieces of information that offset some of the implications of her test score. And so you acknowledge that it's appropriate to look at other information and data points as well, correct? Correct. But I don't believe that the other evidence referenced by the ALJ really contradicted the test scores in any way. And that's, for instance, when the ALJ said, well, her language scores are below, I'm sorry, what the district court said, the language scores are below the cutoff, but her IQ was 77. Well, that's when the broad domain principle comes into play. A child with a marked level language limitation does not also need to show a marked level IQ deficit. And in fact, explained in the brief, a child can't have a marked level language limitation if the IQ scores are also low, because learning disabilities and language disorders, if the child's IQ is consistent with his learning scores or consistent with his language scores, then there's no learning disability. There's simply mental retardation or intellectual deficit. So if you pay attention to the broad domain principle, which as I say, is critical, you cannot find that a language score of say 65 is contradicted by an IQ of 80 or 100. In fact, in that situation, the only reason you're considered to have a language disability is because there is this disparity between IQ and language scores. Other evidence cited by the court, I mean, there are multiple references the court cited to the fact that RRO's speech was intelligible and clear. But speech, of course, is a completely different thing from language. Children who garble their words and have to go to the speech therapist so they can learn to move their tongue in the right way, they have speech problems and they're pretty easily fixed. Let me interrupt for just a minute. I thought that the record included a 2014 report from her teacher who said that RRO was able to relate her experiences and tell stories and use appropriate language to the situation. And in 2015, age-appropriate expressive and receptive language. And you know, of course, we have a substantial evidence standard, which is fairly deferential to the ALJ. So it's hard for me to say that the ALJ was just simply wrong in relying on that evidence and the determination that the day-to-day functioning of language activities was not so limited as to amount to a marked limitation. Why? Okay, well, I would make two responses to that. First, the ALJ himself never explained why he passed that she had low scores. He doesn't say why. He doesn't even acknowledge that the scores were at the marked level or venture to explain the scores are marked, but I'm disregarding them for the following reasons or based upon the following evidence. So at a minimum, there's no way this decision can be affirmed because it's not articulated. And there's a large body of district court cases citing precisely this failure in language cases involving the CELF-4. The other answer I would have is, for instance, that teacher report. This is a teacher who has had the girl in her classroom for about a month. And on the acquiring information page, acquiring and using information page, she says, oh, she's got real problems with all these five or six different language functions. And when she turns to the social page, it's true she doesn't really check the language functions. And I just think it's obvious that she is saying the child has language problems. She simply hasn't noticed them after a month of saying that that is stronger evidence than an uncontradicted language test is just elevating it out of all proportion. Let me ask, I mean, I believe that it is incumbent on the ALJ not just to recite the record, but to provide reasoning. On the other hand, we have some case law in which our court on review has examined the record and determined that substantial evidence supports the ALJ's determination, even if the ALJ did less than an ideal job of explaining his or her reasoning. Is there a reason that we should not take that approach here? Definitely. I think either you look at the case law on decision intelligibility or at the Chenery case law. One thing it says is that basically an ALJ's failure to explain is harmless error. If the only reasonable decision he could have reached is the one he made, we don't really, the fact that he didn't articulate his reasoning is irrelevant. On the other hand, where more than one decision is possible, that is precisely when it becomes critical for the ALJ to explain his reasoning, because for all we know, he may have simply not noticed the evidence. And had he noticed the evidence, he might have said, oh, wow, these scores are really low. This child has a marked limitation. When you don't require the ALJ to articulate even minimally what led him to reach a particular decision, you have no way of telling if the decision was based on correct legal principles. There's a great... Can I ask one more question, if I could? I'm sorry. Am I correct in understanding that the relevant period here is June 13, 2014 to October 2016? Yeah. And I ask that because it struck me that some of the ALJ's comments and his reliance on Exhibit, I guess it was 13F, suggested that he was focusing as much on what the current status of RRO was, and the records suggested that there had been improvement, that the whole family dynamic was improved, and I didn't notice any claim made for a subsequent period. And I was a little concerned about how those two strains in the decision interplay. Do you have any comment on that? Well, I'm not entirely sure I understand. I mean, the relevant period is from the date of application to the date of the ALJ decision. The... Although... So that's 2014 to 2016. Correct. But typically, if this court, for instance, were to find that the decision required outright reversal and an award of benefits, it would simply award benefits and not concern itself with the fact that there's no evidence in the record dealing with 2017, 2018. I mean, I've never seen a decision that came down on that issue. But my concern was that the ALJ looked at the discharge papers from the Metropolitan Center for Mental Health that reflected an admission in 2014 and a final session in 2016 and suggested much improvement, and that would have spoken to the period after the decision was rendered. Oh, no. I think we're a little confused about dates. The child is discharged from Metropolitan, and it's like the very beginning of the decision. Oh, I see. Okay. The following October. What I would say on that issue is that when the parents at the hearing in July say to the judge, by the way, they have told us that our daughter needs to go back into therapy, and in fact, she's got a first appointment at basically New York Presbyterian next month, that that should... I mean, at that point, the judge can't simply assume that the indications of improvement contained in the earlier, the final records from Metropolitan are a sufficient basis for him to conclude that the child isn't disabled. He should have... Thank you for the clarification. Yeah. Okay. So your time has expired. You have reserved two minutes for rebuttal. We'll hear from Mr. Saul. Good morning, your honors. May it please the court. Elizabeth J. Kim for the Commissioner of Social Security. The commissioner's decision in this case should be affirmed because it was supported by substantial evidence, specifically the ALD decision that RRO did not have marks limitations in two domains of childhood functioning or an extreme limitation in one domain was supported by substantial evidence. Moreover, this decision was based on a fully developed record and the ALJ provided a sufficient rationale for his decision. Let me interrupt for a minute. This is Judge Kearney again. I question whether the ALJ provided sufficient rationale. Well, he set out much of the record, or maybe not all of the record, but much of the record. He ended up making conclusions in that kind of one sentence that didn't explain what he credited more or gave more weight to what aspects of a fairly lengthy and complicated record were the basis for his decision generally. There were two places when he cited inconsistency or just asserted that the evidence doesn't support the alleged loss of functioning, but I found very little reasoning here to examine and that was the basis for my question earlier about whether we should just make our independent assessment. Do you believe that, or what can you point us to in the decision that counts, should count as reasoned analysis? Yes, your honor. While the ALJ certainly could have engaged in a more extensive discussion of his rationale, we submit that the ALJ met the minimum standards to support his decision. The ALJ described the medical records and the education records in detail, discussed RRO's testimony as well as that of her mother, discussed the legal standards. Once again, I'm going to interrupt you because I agree with you that the ALJ described a lot of the record, but what I didn't see was the ALJ reasoning from that record and giving an account of what evidence should be weighed heavily and what should be weighed less. Can you point us to parts of this, the decision that accomplished that task? Yes, your honor. Your honor, the ALJ noted the significant improvement of RRO with treatment, particularly looking at the metropolis records in which RRO was noted to make marked improvements in behavior and academic performance. She was able to take care of herself, was no longer a except for some problems with concentration. The ALJ found it significant that her GAF scores demonstrated an improved level of functioning. Specifically, when she first began treatment at Metropolitan, her GAF score was 45. However, at her discharge from Metropolitan, her GAF score was 55 with a high of 60 during the past year. In addition, the ALJ considered the testimony that was provided by RRO. Specifically, she noted that she was a sweet girl with nice parents. He also noted that the problematic behaviors that were described by RRO's parents had occurred mostly in the past. In addition, the ALJ found it significant that the consultative examiner, Dr. Kushner, for which his report, the ALJ described in extensive detail, found no more than moderate mental limitations. Finally, the ALJ also noted Ms. Grube's October 2014 teacher questionnaire in which she noted that RRO's main problem was remaining focused to learn new material, but that since that time that she had made drastic improvement in her behavior and performance since then. We submit that based on the ALJ's consideration and weighing of all of this evidence, substantial evidence supported the ALJ's determination that RRO did not have two marked limitations in two separate domains or an extreme limitation in one domain. Your Honor, specifically with respect to the domain of acquiring and using information, substantial evidence supports the ALJ's finding that RRO had less than a marked limitation in her May 2014 language scores. The Commissioner's regulations make clear that test scores are not dispositive on whether a claimant has a marked limitation in this domain. Instead, they require the ALJ to consider whether those test scores are consistent with her day-to-day functioning in domain-related activities. The Court contends that these test scores are important and asks the Court to find a marked limitation just based on those scores. However, the Commissioner's regulations also provide that the Commissioner will not rely on any test score alone and no single piece of information taken in isolation can establish whether a child has a marked or an extreme limitation. Pursuant to these regulations, the ALJ properly considered the June 2015 IEP report, which noted that RRO's progress was limited by her ability to focus. However, this report also indicated that she had improved in her ability to decode and retell a story using key details. In the area of speech and language, she was able to recall details from the story, such as characters, settings, and events. In addition, the ALJ also noted the upon mental status examination, her speech was normal and that the overall intelligibility of her speech was good, that her expressive and receptive language were age-appropriate. Significantly, the ALJ noted that this opinion provided that RRO's problems did not appear significant enough to interfere with her ability to function on a daily basis, thereby providing evidence that her language scores were not consistent with her day-to-day functioning in this domain. And finally, the ALJ also considered the February 2016 discharge report, which showed that RRO symptoms were decreased, improving, and that her academic performance and behavior were markedly improved with treatment. As to the domain of interacting and relating with others, substantial evidence also supports the ALJ's finding of less than a marked limitation in this domain. While Flora is content that a finding of a marked limitation necessarily leads to a finding of a marked limitation in this domain as well, the ALJ had an obvious problem in using adequate vocabulary and grammar. She had no problems or only slight problems in other activities within the domain. And even assuming arguendo that horrors were correct, that the ALJ should have only focused on language and not on speech, the teacher opined that she had no problems in several language-focused areas. In addition, the ALJ also considered RRO's 2014 social history evaluation, in which her teacher noted that while she tended to be bossy, it was not necessary to implement behavior modification strategies, and RRO had not exhibited significant behavioral problems in the first grade. And finally, the ALJ also considered RRO's treatment records from Metropolitan, which showed significant improvement in the treatment, and also the testimony of RRO's parents, in which they stated that RRO's problematic behaviors had occurred mostly in the past. As to Flora's argument that the ALJ did not fully develop the record, while the ALJ certainly has an affirmative duty to develop the record, and that duty is heightened when a plaintiff is pro se, we submit that the ALJ's decision in this case was based on a fully developed record. These records included medical records from New York Presbyterian Hospital and Metropolitan, DOE records, which included multiple reports, including a speech-language assessment, a social history evaluation report, a psychoeducational evaluation report, a teacher's questionnaire, an IEP report, in addition to consultative examination reports, and the ALJ thoroughly questioned RRO and her mother about her background, activities, academic performance, behavior, medication, and symptoms. Flora cites simply to no authority for the proposition that an ALJ's duty to develop the record extends to record for treatment that had not yet begun at the time of the hearing, that may or may not have existed, particularly where, as here, the claimant had beforehand years of medical and educational records about the claimant. Thank you, counsel. Your time has expired. Mr. Baker, you've retained two minutes for rebuttal. Yes, thank you, Judge. Just quickly on the issue of the sufficiency of the ALJ's explanation of these decisions, the court need not require much, but in a situation where there is standardized test data showing that the child is clearly disabled, if that data is credited, at a minimum, the court has to require the ALJ to acknowledge the existence of that data and in some manner explain why he chose not to credit it. I mean, the judge has got to say something along the lines of, I know there are these test scores, I know they show a marked limitation. I, however, am persuaded by this other evidence. If the judge does that, then we're confident that he's at least read the test scores and knows their significance. In this case, we can have no such confidence. If the court were to affirm this case, then it basically makes the requirements of the ALJ explain his decision essentially meaningless. There are no fewer than 10 district court decisions cited at pages 40 and 41 of our initial brief, which come down on precisely this issue under, in each case, under very similar circumstances. Second point is in terms of the improvements of RRO's behavior, one, that's irrelevant to the language test issue. In any case, RRO's pattern is to improve and then to relapse and to improve and then to relapse. That's why she had to restart therapy. They discontinued therapy after she successfully entered first grade. Four months later, they had to reinstitute it. Now, the second time she stops going to Metropolitan in January of 2016, in July, the parents say, well, she's got to start up again. She does start in August. She is diagnosed with significant psychiatric problems at that point, and the ALJ doesn't issue his decision for another two months. At a minimum, he should have advised the parents to, look, if you get the therapy and I still haven't issued my decision, send the records along. I think at a minimum, he should have waited for the records to come and made an effort to get them, but he should have at least told parents why they might be important and ask to see them if they existed before he issued his decision. The final point is I think the important issue in this case really involves the broad domain principle. The court needs to recognize that to have a marked limitation in the domain, the child only needs to be impaired in one aspect of the limitation in acquiring and using information, even if her IQ is normal, even if her speech is fine. Moreover, under the combination principle, the ALJ should have been adding up her other impairments. The fact that her IQ is only 77 is significant. The fact that she's got pretty severe ADHD should add to the evidence of limitation in the domain. There's no evidence here that the ALJ even considered adding up the impact of RRO's multiple impairments in all of these domains in interacting and relating. She's got not only language difficulties, but she's obviously got some fairly severe behavioral problems. There's a whole process the ALJ is supposed to go through analyzing this data and adding up the impact of multiple impairments. Nothing like that occurs here. Thank you, counsel. Thank you. We'll reserve this session. Thank you both.